### In the Matter of STATES MOTORS, Inc., Bankrupt.

#### No. 33964.

United States District Court
E. D. Michigan, S. D.

Oct. 16, 1958.

Glassen, Parr & Rhead, Lansing, Mich., by R. F. Rhead, Lansing, Mich., for trustee.

Fred W. Kaess, U. S. Atty., Detroit, Mich., by Elmer L. Pfeifle, Jr., Asst. U. S. Atty., Detroit, Mich., for United States, petitioner.

PICARD, District Judge.

### Statement of Facts

State Motors, Inc., the bankrupt herein, was indebted to the Treasury Department, Internal Revenue, for employees' social security and withholding taxes covering the third quarter of 1950. Previous to bankruptcy and about November 9, 1951, bankrupt's assets were sold and its president drew checks from the proceeds thereof to pay its debts. One check for $1,090.94 had been executed previously on November 16, and certified on or near that date, in favor of the Treasury Department to cover the deficit on the 1950 third quarter. It is conceded that this check is not in excess of that obligation. Involuntary petition in bankruptcy was filed against the employer February 27, 1952. In the meantime, bankrupt retained continuous possession of the check after its president, Mr. Kircher, conferred with Charles E. Glohr, Deputy Collector of Internal Revenue November 27, 1951, and showed him the check. The check, however, was not delivered, evidently because bankrupt's bookkeeper questioned both the debt and the amount. The record is clear that actual delivery was not made to the government.

Mr. Kircher, who was ill at the inception of bankruptcy proceedings, had kept the check locked up. Consequently, when the receiver took physical possession of the firm's books, records, and assets, Mr. Kircher was unavailable to turn over this check and several other items. Then about March 20, 1952, Mr. Kircher delivered the check into the possession of Mr. George J. Hutter, an attorney for the firm, with instructions to deliver it to Internal Revenue, Mr. Kircher being convinced at that time that the money belonged to the plaintiff. But instead of doing so, Mr. Hutter sought the Referee's instructions as to disposition of the check and, after examination, the Referee ordered the check turned over to the Trustee as an asset of the bankrupt.

The Treasury Department appeals from that order claiming it has an equitable lien on the check as the res of a

trust fund of which it is the beneficiary. The Referee made appropriate findings of fact and conclusions of law.

## Conclusions of Law

We believe that the Referee in Bankruptcy rested his decision chiefly upon these two issues—

(a) that there had been no real "delivery" as required by the Negotiable Instrument Law; and

(b) that the funds withheld, which constituted a trust fund (pursuant to the then effective Title 26 U.S.C. § 3661) had not been "traced" to the check.

We do not agree.

Title 26 U.S.C. § 3661 provides:

"Enforcement of liability for taxes collected.

"Whenever any person is required to collect or withhold any internal-revenue tax from any other person and to pay such tax over to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States. The amount of such fund shall be assessed, collected, and paid in the same manner and subject to the same provisions and limitations (including penalties) as are applicable with respect to the taxes from which such fund arose. * * * "

Under the above law this money was never a part of the assets of the firm. The bankrupt supposedly collected and withheld the same for the government. From the amount received by the bankrupt a certain percentage of each dollar immediately became the property of the United States. That percentage didn't belong to the employer at all. Now while in theory the employer is supposed to set aside these taxes, as a matter of fact in actual practice very few do exactly that. The funds are usually designated and set aside on the employer's books, in accordance with its own accounting system, and the tax sent to the United States government periodically. That money is not the employer's and should never appear in the firm's assets, but is "set aside" according to the employer's accounting process.

We repeat that while in the case at bar such a fund of money was not set aside immediately when the employer was notified by the government that it owed these taxes, Kircher, its president, had no question about the amount and that the firm owed it, but its accountant questioned both the amount and the debt. So what was done? A check was drawn and the employer immediately had it "certified" by the bank, the money removed from the firm's reachable assets—the words "reachable assets" are important—and theoretically placed in a separate fund by the bank to comply with the provisions of Title 26, Section 3661 U.S.C. The check was not given to the Internal Revenue, but was held temporarily by the employer bankrupt and turned over to its attorney after the bankruptcy proceedings, pending a final decision as to the government's right to all, part, or none of said moneys. Upon certification the bank became liable for that money and from that moment on the sum involved belonged to the United States when and if it was able to prove that bankrupt owed it to the United States. The propriety of the debt is now admitted. The sum in trust was therefore set aside and delivered upon condition. See Downey v. Citizens' State Bank of Noblesville, 100 Ind.App. 158, 194 N.E. 743, 744, where the court said,

"The drawer by consenting to the certification in effect assigned the amount of the check to the bank, and the bank then became the debtor of whosoever should present the same in due course to the bank for payment."

In other words, the bank assumes the debt, but if the bank is insolvent, well the court in Minot v. Russ, 156 Mass. 458, 31 N.E. 489, 16 L.R.A. 510, said: that the drawer himself is still liable on the indebtedness.

In 9 C.J.S. Banks and Banking § 373, p. 789, referring to a certified check, the general law is laid down:

"Unlike a mere acceptance, it (referring to a certified check) is more than a promise by an acceptor to assume the payment thereof; it is a warranty that funds sufficient for that purpose are presently on deposit, and have been set aside for that use and is equivalent to payment."

In other words, here is a separate fund set aside. It's traceable. No other checks, except those beyond the amount set aside to meet the certified check, will be honored by that bank.

■ It is the opinion of this court that there couldn't be any clearer "trust" than this nor any clearer "tracing" of a trust since the moment the check was certified, the specific fund to which Section 3661 applied was thus created. The sum and substance of what the parties had done was this—

"Since we (the employer) collected and withheld this money in 'trust' (Section 3661) and mingled it with our own, so we're now going to make sure that the United States gets money so collected and withheld for the purpose enacted in the act, and we are going to place it in a fund that is unreachable by anyone else until the amount of the tax, if any, is admitted or proven."

The employer not only had a duty to do what it belatedly did, but there are certain penalties under the act which the employer undoubtedly wanted to avoid. Mr. Kircher expressed himself as not wanting to deprive any of the employees from getting this money; but whether that was the real reason or whether he feared something else is immaterial. The employer held this money in "trust" for the United States and then set the money aside, thereby creating an identifiable fund, beyond reach, held in "trust" by operation of law. The presence of the certified check in the case at bar plus the law itself distinguishes this from those cases relied on by the Referee's conclusion that the fund was not traced.

In Barrs v. Barrs Rent-A-Car Co., 71 Ohio App. 465, 50 N.E.2d 388, while the court held that the evidence there was insufficient to trace the "trust" fund in favor of the United States, it does in the syllabus add that you couldn't trace the fund "into balance of deposit" and then the case itself says that there was no evidence to show that

"after payment of the checks for wages, * * * any balance continued thereafter until the receiver was appointed, * * *".

In the case at bar there would be such a "balance", not only after the wages were paid out of the company's bank balance, but before such wages were paid, as long as the bank was solvent.

In Hercules Service Parts Corp. v. United States, 6 Cir., 202 F.2d 938, at page 940, the court uses this significant language:

"It is the general rule that a trust cannot be impressed for the benefit of the *cestui que trust* unless the trust property is identified or the corpus of the trust is traced into some specific fund or thing into which the original trust property has passed in some form."

Here there is such an identification of the trust fund property.

The Negotiable Instrument Act, Comp. Laws 1948, § 439.1 et seq., does not interfere with our conclusion and therefore cases interpretative of negotiable instruments relied on by Trustee—including Vinton v. Peck, 1866, 14 Mich. 287; Burson v. Huntington, 1870, 21 Mich. 415; Thatcher v. Wardens, Etc., St. Andrews Church, 1877, 37 Mich. 264; Gibson v. Dymon, 1937, 281 Mich. 137, 274 N.W. 739; and State of Ohio ex rel. Squire v. Eubank, 1940, 295 Mich. 230, 294 N.W. 166 are not in point.

The court therefore reverses the order of the Referee in Bankruptcy, dated October 19, 1953, and incidentally adds that the delay in deciding this case has not been the fault of this court. We did not have knowledge of this case until within the last ten days since submission of the matter was withheld, as we are informed, at the request of both parties.